# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF ARKANSAS
### FORT SMITH DIVISION

**IN RE: ACME HOLDING COMPANY, INC.**          No. 2:14-bk-71315
                                                    Chapter 11

### ORDER AND OPINION CONVERTING CASE TO CHAPTER 7

On April 29, 2014, Acme Holding Company, Inc. [Acme or the debtor] filed this chapter

11 case.  On October 27, 2014, Acme filed its first disclosure statement and a plan of

reorganization [the plan].[1]  On November 19, 2014, secured creditor Chambers Bank

[Chambers] objected to the adequacy of the debtor's first disclosure statement.[2]  C

Holdings, LLC [C Holdings] also objected on November 20, 2014.[3]  Chambers moved to

dismiss or, alternatively, to convert the debtor's case to a case under chapter 7 on

December 12, 2014.  On December 29, Hildene Asset Management, LLC and Hildene

Opportunities Master Fund, Ltd. [collectively referenced as Hildene or TruPS holders]

---

[1]  The plan that the debtor filed on October 27, 2014, is the only plan that the
debtor has filed to date.

[2]  Chambers loaned the debtor $3,000,000.00 on September 29, 2010, and
$2,000,000.00 on December 16, 2010.  The loans were payable on demand and secured
by the debtor's pledge of its stock in Allied Bank.  Chambers is currently in possession of
the stock certificates pledged as collateral for the two loans.

[3]  In August 2001, the debtor loaned the Bank of Mulberry Employee Stock
Ownership Trust n/k/a the Acme Holding Company, Inc. Employee Stock Ownership
Plan [Acme ESOP] $2,535,000.00 to purchase 103,132.63 shares of newly issued
common stock in the debtor.  Acme ESOP then pledged the stock to the debtor as
collateral for repayment of the loan.  In 2009, the debtor borrowed $2,000,000.00 from
First Southern Bank.  As security for the loan, the debtor assigned to First Southern Bank
the loan, promissory note, and pledge agreement executed by Acme ESOP in favor of the
debtor in 2001.  On May 15, 2014, C Holdings bought the debtor's note from First
Southern Bank's receiver, making C Holdings a secured creditor in Acme's bankruptcy
case.  The debtor owes C Holdings $1,420,222.50, as reflected in the debtor's disclosure
statement and the proof of claim filed by C Holdings on June 3, 2014.

moved to convert the debtor's case to a case under chapter 7.[4]  C Holdings likewise moved to convert the case to a chapter 7 on December 30; neither Hildene nor C Holdings moved to dismiss the case.  On January 6, 2015, the debtor filed an amended disclosure statement [disclosure statement] to which Chambers objected on January 20. Hildene and C Holdings filed objections on January 27 and January 28, respectively. Chambers supplemented its motion to dismiss or convert on February 13, 2015, alleging an additional basis for the dismissal or conversion of the debtor's chapter 11 case to a case under chapter 7.  Six weeks later, the debtor filed the March 29 Supplement,

---

[4]  Trust preferred securities [TruPS] "are preferred equity securities issued by a statutory trust in order to raise capital for the parent bank holding company." *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd.* (*In re FMB Bancshares, Inc.*), 517 B.R. 361, 365 n.1 (Bankr. M.D. Ga. 2014).  "To achieve favorable tax treatment, a bank holding company does not issue TruPS directly.  Instead, a bank holding company forms a wholly-owned trust subsidiary, and that trust issues . . . the TruPS to investors." *Id.* at 365.  Although considered equity for tax purposes, Alex Golden testified at the April 2, 2015 hearing that TruPS are considered debt for regulatory purposes.  Trial Tr. vol I, 106.

On March 26, 2003, the debtor created a statutory trust for the purpose of issuing TruPS under a trust indenture.  U.S. Bank National Association [U.S. Bank], as the indenture trustee of the March 26, 2003 statutory trust, filed a proof of claim on behalf of the TruPS holders on July 25, 2014, in the amount of $3,329,003.68.  On November 21, 2014, U.S. Bank authorized Hildene to act on behalf of the TruPS holders in this case, ostensibly because Hildene owns the majority of the issued and outstanding TruPS.  Due to its majority ownership of the TruPS, Hildene contends that it is a creditor of the debtor–a characterization with which the debtor appeared not to disagree from the inception of this case on April 29, 2014, until March 29, 2015, when the debtor filed its *Supplement to Appendix to Amended Disclosure Statement & Plan of Reorganization of ACME Holding Company, Inc.* [March 29 Supplement].  Prior to filing the March 29 Supplement, the debtor acknowledged the TruPS holders (now acting through Hildene) as "unsecured claimants" in its original and amended disclosure statements and plan.  In the debtor's March 29 Supplement and post-trial brief, the debtor changed its prior treatment of the TruPS holders from a separate class of unsecured claimants that would share in some form of recovery under the debtor's proposed plan of reorganization to equity security holders that the debtor now proposes to pay nothing.

While the Court acknowledges the disagreement between the parties regarding the nature of their relationship, the issue of whether the TruPS holders are creditors or equity security holders is not directly before the Court and, in any event, is not pertinent to the Court's resolution of the motions and objections currently before it.

purporting to change its treatment of Hildene, as discussed in footnote 4, above. On April 1, 2015, the debtor's attorney, Stanley V. Bond, filed with the Court a letter written by attorney Richard L. Ramsay on behalf of Walter Quinn, assertedly one of the debtor's unsecured creditors that acquired the claim of Axys Corporation, expressing Quinn's opposition to the dismissal of the debtor's bankruptcy case.[5]

The Court held a two-day hearing beginning on April 2, 2015 [the April 2 hearing] on the motion to dismiss or convert filed by Chambers, the motions to convert filed by C Holdings and Hildene, and the objections to the adequacy of the debtor's disclosure statement filed by all three creditors.[6] Bond appeared on behalf of the debtor; James Paul Beachboard and Cyril E. Hollingsworth appeared on behalf of Chambers; Charles S. Trantham appeared for C Holdings; and Rex M. Terry appeared for Hildene. Quinn did not appear either personally or through his attorney. At the conclusion of the hearing, the Court advised the parties that it planned to order the trial transcript and asked the parties to submit post-trial briefs in lieu of closing arguments.[7] Upon receipt of post-trial briefs,

---

[5] Although Quinn had not filed a proof of claim as of the April 2 hearing, the debtor listed the debt in its schedules and recognized in its disclosure statement that Axys Corporation had a claim in the amount of $2,000,000.00 that was "believed [by the debtor] to have been assumed by another person or entity." Therefore, the debtor treated the claim as filed pursuant to 11 U.S.C. § 1111(a).

[6] The Court references the three objecting parties as "the creditors" for ease, but, as discussed in footnote 4, makes no finding regarding Hildene's status as either a creditor or an equity security holder at this time.

[7] At the parties' request, the Court gave Chambers, C Holdings, and Hildene 30 days (running from the parties' receipt of the trial transcript) within which to submit their respective post-trial briefs. The Court gave the debtor 21 days from the date of the latest-filed creditor's brief to file its post-trial brief. On April 6, 2015, the Court requested that the debtor's attorney provide to the Court the next Consolidated Report of Condition and Income for A Bank With Domestic Offices Only [April Call Report]. The Court notified the parties that it planned to take judicial notice of the April Call Report when it became available and invited the parties to address the contents of the April Call Report in their respective post-trial briefs if they wished to do so. The debtor's attorney filed the April Call Report on the Court's electronic filing system on April 30, 2015.

the Court took the matters under advisement.  For the reasons stated below, the Court grants Chambers's, C Holdings's, and Hildene's motions to convert the debtor's case to a case under chapter 7.

## Background

The debtor is a single-bank holding company that Alexander Peyton Golden, III [Lex Golden] formed in 1986 for the purpose of acquiring the Bank of Mulberry, an Arkansas state-chartered bank.  Approximately nine years later, Lex Golden's son, Alexander Peyton Golden, IV [Alex Golden] became an officer of the debtor.  Currently, Lex Golden is the Chief Executive Officer [CEO], Chairman of the Board, and Controller of the debtor and Alex Golden is the debtor's Director and President.  The debtor acquired a second Arkansas bank, the Bank of Mansfield, in 2001.  In 2002, the debtor created Allied Bank [or Allied] when it merged the Bank of Mulberry and the Bank of Mansfield.  The debtor owns 100% of the common capital stock of Allied Bank.[8]  The Allied Bank stock is the debtor's only asset and provides income to the debtor in the form of dividend distributions.  Allied was profitable for the six years following its inception.

In 2008, the national economic downturn coincided with two events that affected Allied Bank's capital position.  First, Allied lost approximately $1,500,000.00 as a result of the fraudulent loan scheme that two attorneys–now in prison–committed against several Arkansas banks.  Second, Allied entered into a credit facility[9] with an automobile dealership that grew at a speed sufficient to garner the attention of Allied's federal regulator, the Federal Reserve Bank of St. Louis [the Federal Reserve or the Fed].  As a result, the Federal Reserve conducted a full-scale examination of Allied Bank in 2010.  In

---

[8]  In addition to serving as officers of the debtor, Lex and Alex Golden are also officers of Allied Bank.  Lex Golden is Allied Bank's Special Assets Officer and Alex Golden is Allied Bank's President, CEO, and Chairman of the Board.

[9]  "A 'credit facility' is similar to a revolving line of credit."  *Dahlgren v. Comm'r*, No. 5002-94, 1998 Tax Ct. Memo LEXIS 31, at *9 (U.S.T.C. Jan. 26, 1998).

the course of the examination, the Federal Reserve criticized Allied's credit facility and classified other credits within Allied Bank unfavorably, resulting in a diminished capital position for Allied.[10]  In an effort to infuse working capital and operating funds into Allied, the debtor pledged its Allied stock to Chambers as security for two loans totaling $5,000,000.00.  Despite the loans from Chambers, Allied's capital ratios failed to improve enough to avoid regulatory intervention.[11]  On March 15, 2011, Allied, Acme ESOP, and the debtor entered into an informal private agreement [Memorandum of Understanding] with the Federal Reserve to memorialize an agreed plan to remedy the problems with Allied that had been identified by the Fed.  On May 2, 2012, the private Memorandum of Understanding was replaced by a public Written Agreement.  On November 15, 2011, the Arkansas State Bank Department issued a Cease and Desist Order [C & D Order] to Allied Bank.[12]  Both the Written Agreement and the C & D Order [together referenced as regulatory restrictions or regulatory orders] mandated that Allied raise its capital levels to 10% of its total assets and reduce its classified assets to

---

[10]  Bank examiners "assign quality ratings to extensions of credit that exhibit potential problems or well-defined weaknesses . . . primarily based upon the degree of risk and the likelihood of orderly repayment, and their effect on the bank's safety and soundness."  Div. of Banking Supervision & Regulation, The Federal Reserve Board, Commercial Bank Examination Manual section 2060.1 (4th ed. 1994, Supp. 2015).

[11]  The Federal Reserve "uses two ratios to help assess the capital adequacy of state members: the risk-based capital ratio and the tier 1 leverage ratio.  State member banks may also be subject to separate capital requirements imposed by state banking supervisors."  Div. of Banking Supervision & Regulation, The Federal Reserve Board, Commercial Bank Examination Manual section 3020.1 (Supp. 2011).  Alex Golden testified during the April 2 hearing that "the most common [ratio used by regulators to calculate risk associated with a bank] is the Tier 1 capital ratio, or some call it leverage ratio . . . and that is your Tier 1 capital divided by your total assets."  Trial Tr. vol II, 8, Apr. 3, 2015.  Tier 1 capital is "generally defined as the sum of core capital elements less any amounts of goodwill, other intangible assets . . . and nonfinancial equity investments that are required to be deducted."  The Federal Reserve Board, Commercial Bank Examination Manual section 3020.1.

[12]  At the April 2 hearing, there was conflicting testimony regarding whether the C & D Order, like the Written Agreement, is public.  Regardless, neither the C & D Order nor the Written Agreement were introduced into evidence.

below 50% of primary capital.[13]   The C & D Order specifically prohibited Allied from making dividend distributions to the debtor without the express permission of the Arkansas State Bank Department.[14]   Because the C & D Order extinguished the debtor's only source of income, the debtor was unable to service its debt.   As a result, the debtor filed this chapter 11 case on April 29, 2014.   On October 27, 2014, the debtor filed a plan and disclosure statement.   The debtor filed the amended disclosure statement [disclosure statement] currently before the Court on January 6, 2015.   The disclosure statement drew objections for its perceived inadequacies and served as the apparent catalyst for the creditors' respective motions to dismiss and convert.

**Summary of Debtor's Disclosure Statement**[15]

According to the disclosure statement, the debtor's ability to fund a plan is entirely dependent upon the Arkansas State Bank Department and the Federal Reserve granting Allied Bank permission to resume paying dividends to the debtor.   Specifically, the debtor discloses that

> [i]n order to provide funding for the Plan the Debtor's only asset Allied Bank will reform and reorganize its operations under its own corporate governance and such reform and reorganization of Allied Bank is the foundation of the Debtor's plan to reorganize; therefore, Allied Bank will "shrink" over the next three (3) years such that it meets or exceeds its 10% Tier I Capital required by banking regulations and which is tangible equity

---

[13]   "Extensions of credit that exhibit . . . well-defined weaknesses and a distinct possibility of loss" are deemed classified assets by bank regulators.   The Federal Reserve Board, Commercial Bank Examination Manual section 2060.1.   The debtor did not define the term "primary capital" in its disclosure statement or plan; however, Alex Golden testified that the regulators ordered Allied to reduce its substandard assets to below 50% of total capital.   Trial Tr. vol I, 20, Apr. 2, 2015.

[14]   Theoretically, Allied could seek permission from the Arkansas State Bank Department and the Federal Reserve to make a distribution to the debtor at any time; however, it was undisputed at the April 2 hearing that such a request would be futile at this time.

[15]   The disclosure statement instructs creditors to read the disclosure statement and plan together.

in the Bank.

The disclosure statement provides that "by December 31, 2015, Effective Tier 1 Capital is projected to be . . . [at] 9.95% leaving Tier 1 Capital only 5 basis points below bank's goal of 10%."

In its disclosure statement and plan, the debtor proposes to pay Chambers Bank (Class 1) the full amount of Chambers's secured claim in the amount of $4,593,775.00 at an interest rate of 3.25% over a ten-year period.  The debtor intends to commence quarterly payments to Chambers on "the first day of the first full quarter following removal of regulatory restrictions that currently bar the payment of stock dividends by Allied Bank to its shareholder ACME."  The debtor plans to address the secured claim of C Holdings in the amount of $1,420,222.50 by transferring to C Holdings 300,000 shares of preferred stock that the debtor will issue within 30 days of the effective date of the plan.[16] Similarly, the debtor intends to pay the $2,000,000.00 general unsecured claim (ostensibly now held by Walter Quinn) constituting Class 3 by issuing and transferring to Quinn 2,000,000 shares of preferred stock.  Class 4 is made up of TruPS holders, that, until the March 29 Supplement, the debtor proposed to give 250,000 shares of newly issued preferred stock in satisfaction of the claim filed by the indenture trustee in the amount of $3,329,003.68 and now pursued by Hildene.  The disclosure statement explains that

> [t]he Preferred Stock issued to unsecured creditors under this Plan is a non-voting class of stock in ACME.  The holders of Preferred Stock are not entitled to any representation on the Board of Directors of ACME. The Preferred Stock is freely transferrable and may be inherited.  The Preferred Stock is entitled to dividends before any dividend is paid to the holders of the common stock of ACME and otherwise according to this Plan.

------------------------

[16]  The plan provides that "[w]ithin thirty (30) days of the Effective Date [of the plan] the debtor will issue Preferred Stock."  The effective date of the plan is defined as 14 days following confirmation.

7

The debtor's plan provides that the preferred stock "shall have a par value of $00.01 per share." Under the debtor's plan, Class 5–composed of the debtor's equity holders–will retain their shares of common stock but will not receive distributions under the terms of the proposed plan until "all secured creditors are paid in full and those classes of unsecured claims receiving Preferred Stock receive dividends in an amount equal to their respective claims as determined by this Plan with such amounts determined as of 29th April 2014." The debtor acknowledges the risk that it will be unable to effectuate its proposed plan if Allied Bank fails to "emerge timely" from its current regulatory restrictions and included in its disclosure statement a "drop dead" provision stating that

> [i]n the event the projections for Allied Bank's emergence from regulatory restriction to allow it pay dividends to its shareholders does not occur by the second (2nd) anniversary of the Effective Date ACME will, at its sole option and after a third-party appraisal of the value of Allied Bank stock, surrender to Chambers Bank or its successor in interest stock of Allied Bank in the equivalent value of the claim of Chambers Bank at that time unless ACME and Chambers Bank expressly agree to extend the period.

In the March 29 Supplement, the debtor states that

> When Allied Tier 1 Capital reaches 11.25%, then dividends will be paid out and money used to pay on loans and accrued interest. This is actually dependent on regulatory approval, but we are assuming that once we reach 11.25% tier I capital, that approval will be granted.

The debtor's plan also provides that

> [i]f this Plan is not confirmed, the Court could allow the Debtor to file another plan of reorganization. The Debtor does not currently have an alternative plan finalized and Debtor does not believe that it would be able to propose a plan which offers significantly better treatment to creditors based on current conditions.

## Summary of Arguments

The creditors' overarching–but far from only–objection to the disclosure statement is that it fails to disclose any financial information about the debtor, but instead discusses the

8

speculative projected finances of non-debtor Allied Bank.[17]  As to the information disclosed about Allied, the creditors believe that the debtor's predictions regarding when Allied may emerge from regulatory constraints and resume paying dividends to the debtor are unjustifiably optimistic and unsupported by the evidence.  Chambers's expert witness, Dr. Douglas Southard, testified that Allied's capital ratios are improving at a materially slower rate than predicted by the debtor.  Trial Tr. vol I, 124.  The creditors also argue that the disclosure statement contains no information regarding the amount of the distributions that Allied will pay to the debtor, assuming that the debtor's best-case scenario of Allied being allowed to pay distributions in time to fund its plan becomes a reality.  The creditors contend that even had the disclosure statement provided adequate information about the debtor and its ability to fund the plan, it is futile for the Court to approve the disclosure statement because the underlying plan is patently unconfirmable.

In response to the creditors' criticism of the debtor's disclosure statement, the debtor contends that Allied Bank's financial projections were appropriately disclosed because the debtor's finances are wholly dependent upon Allied Bank's ability to pay the debtor dividend distributions when it is released from its current regulatory restrictions.  The debtor maintains that Allied will be able to shrink its operations and successfully dispose of "owned real estate" [ORE] and other non-performing assets to achieve a Tier 1 level nearing–or even attaining–the 10% mandated by the regulatory restrictions by the end of 2015.  The debtor believes that when Allied raises its Tier 1 capital to 11.25%, the regulators will permit Allied to pay the debtor a dividend.  Based upon the debtor's predictions for Allied's improved capital ratios by the end of 2015, as well as Dr. John Dominick's expert opinion, the debtor anticipates that the regulators could allow Allied to pay dividends to the debtor by mid-2017, if not before.

---

[17]  In its reply to the debtor's post-trial brief, Chambers cites a total of 17 perceived inadequacies with the debtor's disclosure statement.  However, based upon the Court's decision to convert this case to a case under chapter 7, discussed below, the Court summarizes only the objections to the disclosure statement that are also relevant to the creditors' motions to dismiss or convert.

Although the creditors oppose the approval of the debtor's disclosure statement as discussed above, they seek primarily the dismissal or conversion of the case. The creditors believe that cause for dismissal or conversion is established on two bases: (1) the substantial and continuing losses to the debtor's estate as shown in the debtor's monthly operating reports combined with the absence of a reasonable likelihood of rehabilitation; and (2) the debtor's inability to propose a confirmable plan. In support of their contention that the debtor's plan cannot be confirmed, they argue that the plan is not feasible because the debtor has theorized but cannot represent with any level of certainty when–if ever–Allied Bank will be allowed by the Arkansas State Bank Department and the Federal Reserve to resume paying dividends to the debtor that would, in turn, allow the debtor to fund its plan. The creditors also argue that even if Allied is granted permission to begin making dividend distributions to the debtor, the debtor has presented no information regarding the amount of the distributions or any evidence showing that the distributions would be sufficient to fund the debtor's proposed plan. Further, they contend that the plan violates the absolute priority rule because it allows the debtor's equity holders to retain ownership of common stock without paying senior claims in full. The creditors stress that the plan does not require the debtor's equity holders to contribute any outside capital or assets to fund the plan. Instead, it provides the debtor's equity holders with a chance to improve their position should Allied timely emerge from regulatory restrictions and resume making dividend payments to the debtor, but contains no commensurate downside for the equity holders in the event that Allied fails to recover from its current difficulties as the debtor hopes. Additionally, the creditors object to being required to wait for over two years for the possibility–but not the assurance–that the debtor will begin making payments under the plan at that point while the creditors bear the full risk of depreciation of the Allied stock in the interim. Finally, the creditors assert that the debtor's plan cannot be confirmed because it provides for the issuance of non-voting equity securities (in the form of preferred stock) in contravention of the bankruptcy code section mandating that corporate debtors include a provision in the

10

corporate charter prohibiting the issuance of non-voting equity securities.[18]  The creditors allege that the debtor has failed to rebut the cause that has been established for dismissal or conversion by proving the existence of unusual circumstances sufficient to allow the Court to deny their respective motions to dismiss or convert based upon the best interests of the creditors and the debtor's estate.

In response to the creditors' motions to dismiss or convert, the debtor admits that its operating reports have shown a continual deficit since the filing of this case.  However, the debtor urges the Court to overlook the unrelenting losses reflected in the operating reports because they are due to the debtor having no source of income except for the dividends from Allied Bank that have been halted by the regulators.  The debtor argues that Allied disagreed with many of the diminished capital figures that the regulators criticized prior to implementing the regulatory restrictions because they were caused by one-time occurrences that appeared to impact, but do not accurately reflect, Allied's capital position.  In any event, the debtor contends that Allied plans to improve capital ratios by selling off distressed, non-performing assets at an accelerated rate and shrinking its operations.

The debtor represents in its disclosure statement that Allied will raise its Tier 1 capital to within 5 "basis points" of the 10% mandated by the regulatory orders by December 31, 2015.  Lex Golden testified at the April 2 hearing that Allied's Tier 1 capital was "almost at 8%" and that he expected the regulators to grant Allied permission to pay dividends "before Easter next year [2016]".  Trial Tr. vol I, 226.  The debtor's expert, Dr. Dominick, testified more cautiously that the regulators could lift the orders prohibiting Allied from paying dividends as early as the end of 2016, but that it is more likely that the regulators will grant Allied permission to pay dividends in mid-2017.  Dominick

---

    [18]  Section 1123(a)(6) provides that the plan of a corporate debtor shall "provide for the inclusion in the charter of the debtor . . . a provision prohibiting the issuance of nonvoting equity securities . . . ."  11 U.S.C. § 1123(a)(6).

testified that although Allied's numbers do not look good at this time, some areas are showing improvement. Dominick could not guarantee that Allied was stable as of the April 2 hearing, but testified that Allied is in a better position at this time than it "has been over the past few years." Trial Tr. vol II, 166, 184-86.

The debtor did not respond to the creditors' arguments relating to the confirmability of the debtor's plan. Specifically, the debtor failed to address the contention that the plan violates the absolute priority rule. Likewise, the debtor failed to explain why the provision that calls for the debtor's issuance of new non-voting preferred stock in satisfaction of the claims of three classes of creditors–two after the March 29 Supplement that proposed to exclude the TruPS holders from plan participation–is not a violation of the code provision specifically prohibiting that very thing.

## Findings of Fact and Conclusions of Law

As a threshold matter, the Court recognizes that confirmation of the debtor's plan is not before it at this time. However, the debtor's *ability* to effectuate a confirmable plan is relevant to the resolution of the creditors' respective motions to dismiss or convert and to the approval or disapproval of the debtor's disclosure statement. *Fossum v. Fed. Land Bank* (*In re Fossum*), 764 F.2d 520, 521-22 (8th Cir. 1985) (dismissal is proper if the court finds that a debtor is unable "to effectuate any plan which would be confirmable"); *In re Schriock Constr., Inc.*, 167 B.R. 569, 576 (Bankr. D.N.D 1994) (in determining whether to dismiss or convert a case, a court must assess the feasibility of rehabilitation, evaluate "confirmational prerequisites under § 1129," and consider "whether it is reasonable to believe that the debtor will be able to effectuate a confirmable plan of reorganization under any scenario."); *see also In re Am. Capital Equip., Inc.*, 405 B.R. 415, 423 (Bankr. W.D. Penn. 2009) (disclosure statement must be rejected when it describes a facially unconfirmable plan). Therefore, in deciding the matters before it, the Court must take into consideration the statement in the debtor's plan providing that the debtor "does not believe that it would be able to propose a plan which offers significantly better treatment to creditors based on current conditions." Because the resolution of the

12

creditors' respective motions to dismiss or convert may moot the issue of the adequacy of the debtor's disclosure statement, the Court will first determine whether dismissal or conversion is mandated in this case before addressing, if necessary, the objections to the debtor's disclosure statement. *See Hunt v. Griffin* (*In re Hunt*), 550 F.3d 1002, 1003 (10th Cir. 2008) (holding that the conversion of a case under chapter 13 to one under chapter 7 rendered moot issues relating to chapter 13).

Based on the pleadings before it, the Court must consider the dismissal or conversion of the debtor's case. Chambers alone moved to dismiss the debtor's case. The creditors (including Chambers, pleading in the alternative) moved to convert the debtor's case from a chapter 11 to a chapter 7 under 11 U.S.C. § 1112(b), which states:

> (1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

As the movants, the creditors bear the burden of establishing cause to dismiss or convert this case. *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 517-18 (8th Cir. 2004). Grounds constituting cause to dismiss or convert are enumerated in § 1112(b)(4) and include "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The examples of cause cited in § 1112(b)(4) are not an exhaustive list. *Reagan v. Wetzel et al.* (*In re Reagan*), 403 B.R. 614, 620 (B.A.P. 8th Cir. 2009). As stated previously, cause may also be established by a debtor's inability to effectuate a confirmable plan. *In re Fossum*, 764 F.2d at 521-22.

## I.      Cause under § 1112(b)(4)(A)

The Court finds that the creditors proved that the debtor's estate has incurred substantial

and continuing losses since the debtor filed this case and that it is not reasonably likely that the debtor will be rehabilitated, establishing cause to dismiss or convert this case under § 1112(b)(4)(A). For purposes of subsection (b)(4)(A), "a substantial and continuing loss to or diminution of the estate can be shown 'by demonstrating that the debtor incurred continuing losses or maintained a negative cash flow position after the order for relief.'" *In re Walton St. Prop.*, No. 5:11-bk-70291, 2011 WL 7179642, at *13 (Bankr. W.D. Ark., July 1, 2011) (quoting *In re Schriock Constr., Inc.*, 167 B.R. at 575). The debtor's monthly operating reports reflect–and the debtor admits–that it has sustained substantial and continuing losses each month since the beginning of its bankruptcy case. The debtor's operating report for April 2014, the month the debtor filed bankruptcy, showed a loss of $108,900.00. In March 2015, the debtor's operating report reflected a cumulative loss of $1,477,694.00 since filing bankruptcy–a substantial loss by any measure.[19] Therefore, the Court finds that the first of the two required elements of subsection (b)(4)(A) is satisfied.

The second element of (b)(4)(A)–the reasonable likelihood of rehabilitation–references "a debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d at 516. Rehabilitation "does not necessarily denote reorganization, which could involve liquidation. Instead, rehabilitation signifies something more, with it being described as 'to put back in good condition; re-establish on a firm, sound basis.'" *In re Walton St. Prop.*, 2011 WL 7179642, at *20 (quoting *In re Fall*, 405 B.R. 863, 867-68 (Bankr. N.D. Ohio 2009)). The debtor explained and the Court finds credible that the debtor's enduring losses stem from the Federal Reserve and the Arkansas State Bank Department issuing regulatory orders to Allied that forced it to impose an indefinite hiatus upon the debtor's only source of income.

---

[19] The most recent operating report filed by the debtor on June 22, 2015, shows a cumulative loss since of $1,960,259.00 since filing this case fifteen months ago.

14

However, the debtor's explanation also represents the crux of the problem with this case–the debtor's continuing losses, and its only proposed hope for stanching those losses and emerging from its current situation on sound footing, rest upon Allied Bank and its regulators, *two non-debtors*.  "A plan for rehabilitation under Chapter 11 must be based on more than speculative data.  Although projections are just that and there will always be a degree of uncertainty as to what actual results will be, feasibility must be predicated upon objective facts using known operational inputs and expenditures."  *In re Schriock Constr., Inc.*, 167 B.R. at 576-77.

For the reasons the Court will enumerate below, the debtor has no way of predicting the timing or amount of its "operational inputs" because it does not know if or when Allied will resume paying dividends.  All parties agree that Allied must meet certain regulatory prerequisites before it will be allowed to pay distributions to the debtor.  Because neither of the regulatory orders were introduced into evidence, the Court is not privy to every mandate contained within the orders.  Nonetheless, it is undisputed that Allied must raise its Tier 1 capital to 10% to be in compliance with the regulatory orders and that Allied's compliance with the regulatory orders constitutes the first step toward obtaining permission to pay dividends to the debtor.  A significant aspect of Allied's strategy to attain the 10% Tier 1 level dictated by the regulatory orders involves disposing of ORE and other nonperforming assets currently on the bank's books.  The debtor projects that Allied will drastically reduce its ORE and other classified assets by the end of 2015.  Chambers Ex. 24.  The creditors' expert, Dr. Southard, testified that the rate at which the debtor predicts that Allied will be able to dispose of the ORE is "faster than they have been able to reduce those categories historically," leading Southard to conclude that "the plan is very dependent upon a pretty substantial and not historically supportable rate of reduction in nonperforming assets."  Trial Tr. vol II, 133-34.[20]

---

[20]  Chambers also called Landi Mkhize, the Chief Financial Officer of Chambers Bank since 2014, and a former Arkansas State Bank examiner, to testify on April 2.  Mr. Mkhize testified, like Southard, that the debtor's projected speed for Allied's disposal of

Even if Allied is able to successfully raise its Tier 1 capital to 10% (in part by reducing its ORE at the accelerated rate that the debtor predicts despite Allied's past rate of accomplishment in this area), Allied will not yet have reached the end of its struggle to improve its Tier 1 levels.  Although 10% is the Tier 1 level mandated by the current regulatory orders, according to the March 29 Supplement, the debtor believes that the regulators will allow Allied to pay dividends when its Tier 1 capital reaches 11.25%–not 10%.   Evidently, even if Allied complies with the current regulatory restrictions, it will still fall short of the Tier 1 level required by the regulators *for the payment of dividends*. When Alex Golden was asked upon cross-examination the basis for the debtor's belief that the regulators would approve dividends if Allied's Tier 1 capital reaches 11.25%, he responded that it "seems reasonable."  Trial Tr. vol I, 56.   However, the record is replete with instances in which both Lex and Alex Golden expressed their disagreement with the views of Allied's regulators, making it apparent to the Court that the opinions of the Goldens and the regulators are unlikely to be the same and are certainly not interchangeable.  In any event, Alex Golden readily acknowledged that the 11.25% figure was merely "a guess."  Trial Tr. vol II, 104.

If the regulatory orders currently in place require Allied to raise Tier 1 capital to 10%, but the debtor believes that the regulators will, in actuality, require Allied's Tier 1 to reach 11.25% before Allied may pay dividends, then the Court cannot rule out the possibility that the regulators may require Allied to reach a level of Tier 1 capital that is *higher* than 11.25% before granting Allied permission to pay dividends.[21]  As a result, the Court finds that the level of Tier 1 capital that Allied must attain before the regulators permit Allied to pay dividends is a question that the Court cannot answer with the record before it.

---

ORE by the end of 2015 is "very unusual and very unlikely."  Trial Tr. vol I, 171-73.

[21]  The Court would likely have accorded significant weight to the testimony of a bank examiner or regulator had any party to the April 2 hearing called one to testify.

16

Further, even assuming that Allied raises its Tier 1 capital to the unknown level required by the regulators for the payment of dividends, Allied must then clear the penultimate hurdle of proving to the regulators that such payments will not destabilize the bank.  The debtor's expert witness, Dr. Dominick, testified that in order for Allied to demonstrate that paying dividend distributions will not jeopardize the bank's stability once it has been achieved, Allied will have to sustain its improved capital ratios for approximately one year before the regulators will allow it to make a distribution to the debtor.  Trial Tr. vol II, 165-66.  Therefore, according to Dominick, the regulators *might* approve Allied's payment of dividend distributions to the debtor by the end of 2016, but it is more likely that the regulators will not approve distributions until mid-2017.  Dominick readily admitted on cross-examination that his mid-2017 estimate was just his opinion and that "*it could be even later*" than mid-2017.  Trial Tr. vol II, 186.  The debtor did not introduce any evidence regarding the amount of the distributions that Allied will make in the event that it meets all of the regulatory requirements necessary to pay dividends at all.

In summary, the debtor has offered the following in support of its ability to rehabilitate and emerge as a viable economic enterprise: (1) the debtor's stated confidence in Allied's plan to improve its Tier 1 levels comprised, in part, by selling ORE and non-performing assets at a speed greater than Allied has accomplished the same task historically; (2) guesses regarding capital ratios that the regulators might deem sufficient to allow Allied to pay dividends to the debtor; and (3) hypotheses regarding the timing of regulatory approval should the debtor's postulated prerequisites occur.  As a result, it is evident to the Court that the debtor simply does not know and cannot control how long the regulators will restrict Allied Bank's payment of dividends, making the debtor a spectator rather than a decision-maker when it comes to its financial future.  Therefore, the Court finds that the debtor's plan for rehabilitation is impermissibly founded upon speculation.[22]  As a result, the Court concludes that there is "the absence of a reasonable

---

[22]  Although the Court anticipated that the April Call Report would be of assistance in evaluating whether Allied was on track to meet the debtor's predicted

likelihood that the debtor will be rehabilitated." [23]  Because the Court finds both substantial and continuing losses to the estate and the absence of a reasonable likelihood of rehabilitation, the Court finds that there is cause to dismiss or convert under § 1112(b)(4)(A).

## II.      Cause due to debtor's inability to propose confirmable plan

Due to the speculative nature of the debtor's plan as detailed in the preceding section, and for the additional reasons discussed below, the Court finds that the creditors proved that the plan filed by the debtor on October 27, 2014–the only plan proposed by any entity since this case was filed approximately a year and a half ago–is not confirmable. Because of the debtor's representation that it cannot propose a plan containing significantly better terms for creditors–a representation supported by the debtor's March 29 Supplement that worsened the TruPS holders' treatment under the plan–the Court finds that the debtor's inability to propose a confirmable plan establishes additional grounds for the Court to dismiss or convert this case.  *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011) (citing *In re DCNC North Carolina I, LLC*, 407 B.R. 651, 665 (Bankr. E.D. Pa. 2000) ("the inability to effectuate a plan, by itself, provides cause for dismissal or conversion of a chapter 11 case.")).

─────────────────────

improvements to Allied's capital position, the parties' respective post-trial briefs raised additional questions regarding the correct interpretation of the figures in the report.  As a result, the Court did not accord much, if any, weight to the report.  However, even had the Court accepted without question the debtor's interpretation of the April Call Report, the improvement to Allied's position would not have been enough to tip the scales in the debtor's favor when weighed against the rest of the evidence before the Court.

[23]   Additionally, there is authority for the proposition that a holding company cannot "rehabilitate" within the meaning of § 1112(b)(4)(A).  *See, e.g., In re First Fin. Enter. Inc.*, 99 B.R. 751, 755 (Bankr. W.D. Tex 1989) ("this case should be dismissed pursuant to section 1112(b) since there is an absence of a reasonable likelihood of rehabilitation.   The Debtor is a holding company and has no ongoing business operations.")

Section 1129 contains the requirements for plan confirmation and provides, in part, that the court "shall confirm a plan only if all of the following requirements are met[.]"  11 U.S.C. § 1129(a).  The first requirement for confirmation is that "the plan complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1).  One such applicable provision is § 1123(a)(6), which provides that a chapter 11 plan "shall provide for the inclusion in the charter of the debtor, if the debtor is a corporation . . . of a provision *prohibiting* the issuance of non-voting equity securities . . . ."  11 U.S.C. § 1123(a)(6) (emphasis added).[24]

> This section codifies a position long supported by the Securities Exchange Commission that participation in, and control of, the selection of the management of a reorganized debtor must be considered as part of a fair and equitable plan and provided for accordingly.  The securities must be distributed so that the allocation of voting power properly recognizes the respective position of the claimants and stockholders.

*In re Mesa Air Group, Inc.*, No. 10-10018, 2011 WL 320466, at *8 (Bankr. S.D.N.Y., Jan. 20, 2011) (citing 7 Collier on Bankruptcy ¶ 1123.01[6] (16th ed. 2010)).  Section 1123(a)(6) "prevents the issuance of a class of stock without the possibility of exercising any vote."  *Id.*  Despite this statutory proscription against the issuance of non-voting stock, the debtor's plan provides that "[w]ithin thirty (30) days of the Effective Date [of the plan] the debtor will issue Preferred Stock."  The disclosure statement makes clear that the preferred stock is a "non-voting class of stock in ACME" and that "[t]he holders of Preferred Stock are not entitled to any representation on the Board of Directors of ACME."  The debtor has, inexplicably, opted not to address the creditors' objections to this plan provision or offer to the Court any basis upon which it could approve the issuance of non-voting stock as proposed in the debtor's disclosure statement and plan.  As a result, the Court finds that the debtor's plan cannot be confirmed because it does not comply with §1123(a)(6).[25]

---

[24]  The code defines an "equity security" as "a share in a corporation, whether or not transferable or denominated 'stock', or similar security[.]" 11 U.S.C. § 101(16)(A).

[25]  The Court was able to locate one chapter 11 plan in another jurisdiction that was confirmed despite providing for the issuance of non-voting stock.  *See In re CIB*

Section 1129(a)(11) provides as a condition of confirmation that "[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This provision, known as the feasibility requirement, "requires the court to find that the plan is 'workable' before it may be confirmed." *Danny Thomas Prop. II Ltd. P'ship et al. v. Beal Bank, S.S.B* (*In re Danny Thomas Prop. II Ltd. P'ship*, 241 F.3d 959 (8th Cir. 2001) (citing *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir. 1985)). Although a plan's success "need not be guaranteed," a "bankruptcy court cannot approve a plan unless it has at least a reasonable prospect for success." *In re Danny Thomas Prop. II Ltd. P'ship*), 241 F.3d at 963 (internal quotations omitted). A finding of feasibility requires the court to determine that it is probable that the debtor will carry out the provisions of a plan. *Clarkson v. Cooke Sales & Srv. Co.*, (*In re Clarkson*), 767 F.2d 417, 420 (8th Cir. 1985). "Sincerity, honesty, and willingness are not sufficient to render a plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation *can be done as a practical matter* under the facts."[26] *Id.* (emphasis added). In this case, the Court finds that the debtor's plan is not feasible for the reasons enumerated in section I., above. Additionally, the Court finds that the plan is not feasible because the debtor cannot, as a practical matter, carry out a plan that the Court does not have the authority to confirm due to its violation of § 1123(a)(6) and other applicable provisions within the code. *See United States Aid Funds, Inc. v. Espinosa*, 560 U.S. 260 (2010).

---

*Marine Bancshares, Inc.*, Case No. 09-33318, (Bankr. E.D. Wis. 2009). However, the plan that was confirmed in *In re CIB Marine Bancshares, Inc.* was designated as a "prepackaged plan of reorganization" to which all creditors agreed prior to filing and was confirmed prior the Supreme Court's ruling in *United States Aid Funds, Inc. v. Espinosa*, 560 U.S. 260 (2010), that bankruptcy courts have an obligation not to confirm a plan containing provisions contrary to the code, even if there are no objections.

[26] If the success of the debtor's rehabilitation were dependent only upon the willingness, sincerity, and optimism of the Goldens, the debtor would have prevailed.

The creditors have also alleged that the debtor's plan cannot be confirmed because it violates the "absolute priority rule–shorthand for the language of 11 U.S.C. § 1129(b)(2)(B)(ii)–[providing] that unsecured creditors will be paid in full before equity holders receive anything." *In re Civic Partners Sioux City, LLC*, No. 11-00829, 2013 WL 5534743, at 33 (Bankr. N.D. Iowa Oct. 7, 2013). Section 1129(b)(2)(B)(ii) states, in relevant part, that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ." 11 U.S.C. § 1129(b)(2)(B)(ii). "A shareholder who retains an equity interest in the enterprise or the right to run the company under a plan of reorganization unquestionably retains 'property' within the meaning of the rule." *In re Schriock Constr., Inc.*, 167 B.R. at 578 (citations omitted). "The retention of an equity interest is tantamount to receiving property even if the interest has no value." *Id.* (citing *In re Landau Boat Co.*, 8 B.R. 436, 438 (Bankr. W.D. Mo. 1981)).


In this case, the debtor has proposed to satisfy Class 3, comprised of the $2,000,000.00 unsecured claim held by Quinn, by issuing and transferring to Quinn 2,000,000 shares of preferred stock. Despite the debtor's March 29 Supplement proposing to completely exclude the TruPS holders in Class 4 from recovery, the only *plan* that the debtor has filed contemplates a form of payment for Class 4 similar to that proposed for Class 3: the debtor intends to issue and transfer to the indenture trustee 250,000 shares of preferred stock in satisfaction of the TruPS holders' unsecured claim of $3,329,003.68. The debtor's plan states that the par value of the preferred stock will be one cent per share, translating to Quinn receiving $20,000.00 worth of preferred stock in satisfaction of his claim of $2,000,000.00, and the TruPS holders receiving $2500.00 worth of preferred stock in satisfaction of the indenture trustee's claim of $3,329,003.68.[27] Meanwhile, the

---

[27] During the April 2 hearing, Alex Golden confirmed on redirect that the par value of the preferred stock would be one cent. Trial Tr. vol I, 99. However, when asked to confirm that the TruPS holders would receive stock worth $2500.00, Golden stated that it was his understanding that the TruPS holders would receive $250,000.00 *worth* of preferred stock, not 250,000 *shares* of preferred stock valued at $2500.00. Trial Tr. vol I,

debtor's equity holders in Class 5 "will retain their shares of common stock but will not receive distributions under the terms of the proposed plan until all secured creditors are paid in full and those classes of unsecured claims receiving Preferred Stock receive dividends in an amount equal to their respective claims as determined by this Plan with such amounts determined as of 29th April 2014." The debtor's equity holders, therefore, are retaining "property" in the form of shares of common stock without paying unsecured claims in full. As a result, the Court finds that the debtor's plan as proposed violates the absolute priority rule.[28] The debtor's "ability to comport to the requirements of the absolute priority rule . . . sheds a powerful ray of light on the debtor's ability to rehabilitate and its prospects for effectuating a confirmable plan." *In re Schriock Constr., Inc.*, 167 B.R. at 579. In this case, the debtor's violation of the absolute priority rule forms another basis for the Court's finding that the debtor cannot effectuate a confirmable plan under the strictures of the code, constituting cause for dismissal or conversion.

## III.      Exception to dismissal or conversion inapplicable

Because the creditors have successfully proven cause, the Court must dismiss or convert

---

101.  Under either scenario, the debtor proposes to give the TruPS holders preferred stock with a par value less than that stated in their proof of claim of $3,329,003.68. He likewise attempted to clarify that it was his understanding that Quinn would receive $2,000,000.00 worth of preferred stock. Although Alex Golden testified that the actual value of the preferred stock would be, he assumed, $1.00 per share rather than one cent per share, the Court has no objective evidence regarding the actual value of preferred stock that has not been issued (and cannot be issued pursuant to §1123(a)(6)).

[28]  The creditors also emphasize that the debtor's plan does not require the debtor's equity holders to provide any new capital or otherwise contribute to the plan. To the extent that they are asserting that the uncodified "new value" exception to the absolute priority rule is not applicable in this case, the Court agrees–assuming that the exception is available at all in this jurisdiction–because the Court finds that the debtor's equity holders are contributing no new value under the proposed plan. *See In re Civic Partners Sioux City, LLC*, No. 11-00829, 2013 WL 5534743, at *34 (Bankr. N.D. Iowa Oct. 7, 2013) (declining to rule on the applicability of the purported new value exception because the amount of the new value proposed in the debtor's plan was "entirely insufficient" even had the exception applied).

the case unless

> the court finds and specifically identifies unusual circumstances
> establishing that converting or dismissing the case is not in the best
> interests of creditors and the estate, and the debtor or any other party in
> interest establishes that–
>
> > (A) there is a reasonable likelihood that a plan will be
> > confirmed within the timeframes established in sections
> > 1121(e) and 1129(e) of this title, or if such sections do not
> > apply, within a reasonable period of time; and
> > (B) the grounds for converting or dismissing the case
> > include an act or omission of the debtor other than under
> > paragraph (4)(A)[.]

11 U.S.C. § 1112(b)(2).  Consequently, for the debtor to avoid dismissal or conversion in the face of established cause, the Court must find and specifically identify unusual circumstances that make conversion or dismissal not in the creditors' best interests *and* the debtor must establish that (1) there is a reasonable likelihood that the debtor will confirm a plan within the time allowed by the code or the Court; and (2) cause for dismissing or converting the case does not include paragraph (4)(A)'s "substantial or continuing loss to or diminution of the debtor's estate and the absence of a reasonable likelihood of rehabilitation."  *Id.*  The Court finds that the prerequisites for the application of this section are not met for two reasons.  First, as discussed in this Opinion, the Court finds that the debtor did not establish that it is reasonably likely that it will confirm a plan at any point.  Second, because the Court finds cause under § 1112(b)(4)(A), the Court does not have the ability to grant the debtor a reprieve from dismissal or conversion under the exception in § 1112(b)(2).  *See In re Plymouth Oil Co., LLC*, No. 12-01403, 2014 WL 3812078, at *5 (Bankr. N.D. Iowa, Aug. 1, 2014) (because cause to convert a chapter 11 to a chapter 7 was established under §1112(b)(4)(A), the exception to conversion or dismissal found in § 1112(b)(2)(B) was unavailable to the debtor as a matter of law).

**Conclusion**

For the reasons stated above, the Court finds that it must dismiss or convert the debtor's case pursuant to § 1112(b), whichever is in the best interests of the creditors and the estate.  "'There is no 'bright-line' test to determine [whether] conversion or dismissal is in the best interests of creditors and the estate.'"  *In re Babayoff*, 445 B.R. at 81 (quoting *In re Westhampton Coachworks, Ltd.*, Nos. 09-73008-ast, 09-73009, 2010 WL 5348422, at *6 (Bankr. E.D.N.Y. Dec. 21, 2010); *In re Tuscan Sun Ristorante, Inc*. 2010 WL 4929444, at *3 (Bankr. E.D.N.Y. Nov. 30, 2010).  When a majority of creditors favor conversion over dismissal or vice versa, their consensus may guide the court in deciding which option is in the best interests of the creditors and estate.  *Rollex Corp. v. Assoc. Materials, Inc.* (*In re Superior Siding & Window*), 14 F.3d 240, 242 (4th Cir. 1994).  Chambers is the only creditor that moved to dismiss the debtor's case.  However, Chambers also moved, in the alternative, to convert the debtor's case to a case under chapter 7, and thus, effectively promoted both options.  C Holdings and Hildene moved solely to convert.  In this case, the Court concurs with the consensus of the creditors and finds that conversion would result in an orderly liquidation of the debtor's sole asset, the stock in Allied Bank, and effectuate the code's "policy of 'vigorous maximization of the value of the economic enterprise.'" *Id.* at 82 (quoting *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1992)).  The Court finds that this case should be converted to a case under chapter 7.  The Court further finds that the creditors' objections to the debtor's disclosure statement are rendered moot by the Court's order converting the case to a case under chapter 7.


IT IS SO ORDERED.


*Ben Barry*
Ben Barry
United States Bankruptcy Judge
Dated:   07/22/2015

24

cc:   Stanley V. Bond, attorney for debtor
      James Paul Beachboard, attorney for Chambers Bank
      Cyril E. Hollingsworth, attorney for Chambers Bank
      Charles S. Trantham, attorney for C Holdings, LLC
      Rex M. Terry, attorney for Hildene Asset Management, LLC and
      Hildene Opportunities Master Fund, Ltd.
      United States Trustee